# EXHIBIT B

LEASE AGREEMENT

BY AND BETWEEN

MATSON NAVIGATION COMPANY
OF ALASKA, LLC ("LANDLORD")

AND

PARADIGM MARINE, LLC
("TENANT")

NOVEMBER 1, 2020

## TABLE OF CONTENTS


RECITALS ....................................................................................................1

TERMS ........................................................................................................1

1. DESCRIPTION OF LEASED PREMISES; DEMISE ........................................1

   1.1. Premises ..........................................................................................1

2. TERM ......................................................................................................2

   2.1. Initial Term .......................................................................................2

   2.2. Renewal Terms ..................................................................................2

   2.3. Additional Provisions Regarding Term ....................................................2

   2.4. Holdover Tenancy ..............................................................................2

3. RENT .......................................................................................................3

   3.1. Base Rent During Initial Term ................................................................3

   3.2. CPI Index ..........................................................................................3

   3.3. Payments Due under Tariff such as Wharfage and Dockage ..................3

   3.4. Base Rent After Initial Term ..................................................................4

   3.5. Additional Rent ....................................................................................4

   3.6. Payments of Rent ................................................................................4

   3.7. Liquidated Damages .............................................................................4..

4. TAXES AND ASSESSMENTS ......................................................................5

   4.1. Sales Tax on Rent Paid Under this Lease Agreement.............................5

   4.2. Real Property Taxes and Assessments - Payment by Landlord ..............5

   4.3. Personal Property Taxes.......................................................................5

5. USE OF PROPERTY ...................................................................................5

   5.1. Regional Oil Spill Response Hub ...........................................................5

5.2. No Assignment or Sublease by Tenant. .....5
6. TENANT'S ACCEPTANCE OF PREMISES .....6
7. NO WASTE, NUISANCE, OR UNLAWFUL USE .....6
8. ENTRY BY LANDLORD .....7
9. TENANT'S REPAIRS, MAINTENANCE AND OTHER OBLIGATIONS .....7
9.1. TENANT RESPONSIBLE FOR ALL REPAIRS, RESTORATIONS .....7
9.2. MAINTANANCE SERVICES .....7
9.3. UTILITIES .....8
10. LANDLORD'S REPAIR OR MAINTENANCE OBLIGATIONS .....8
11. TENANT'S IMPROVEMENTS AND ALTERATIONS .....8
11.1. Notice .....8
11.2. Tenant Liable for all Costs .....8
11.3. Ownership on Termination of Lease .....8
11.4. No Permanent Structures on USF&W Property .....9
12. TENANT'S OBLIGATIONS ON TERMINATION OF LEASE .....9
12.1. Tenant's Obligation to Re-Grade Yard .....9
12.2. Tenant's General Obligations .....9
13. LIENS AND LIEN CONTESTS .....9
14. TENANT TO CARRY INSURANCE .....10
14.1. Liability Insurance .....10
14.2. Casualty and All-Risk Insurance .....10
14.3. Waiver of Indemnity and Subrogation .....11
14.4. Workers Compensation Insurance .....11
14.5. Longshore and Harbor Workers Compensation Act Insurance .....11
14.6. Insurance Policies .....11
15. DESTRUCTION OF PROPERTY .....12
15.1. Substantial Damage - Insurance Coverage .....12
15.2. Substantial Damage - No Insurance Coverage .....12

16. RISK OF DAMAGE OR LOSS TO TENANT'S PERSONAL PROPERTY ............13
17. EFFECT OF EMINENT DOMAIN PROCEEDINGS ........................................13
**18.** ENVIRONMENTAL MATTERS ..........................................................................13
18.1. Landlord Warranty
18.2. Compliance with Environmental Law ...................................................13
18.3. Environmental Law and Hazardous Material .......................................14
19. DEFAULTS .......................................................................................................14
19.1. Events of Default .....................................................................................14
19.2. Landlord's Remedies ................................................................................15
19.3. Tenant’s Remedies ...................................................................................15
**20.** COVENANT OF QUIET ENJOYMENT ..........................................................16
21. ESTOPPEL STATEMENTS ...............................................................................16
22. INDEMNITY .......................................................................................................16
22.1. Indemnification by Tenant. .........................................................................16
22.2. Demand by Indemnified Person ...........................................................17
22.3. Not Exclusive/Survival ..............................................................................17
23. ADDITIONAL PROVISIONS ............................................................................17
23.1. First Right of Refusal ..................................................................................17
23.2. Notice.............................................................................................................18
23.3. Attorney's Fees ............................................................................................18
23.4. No Waiver .....................................................................................................18
23.5. No Broker Commissions ...........................................................................18
23.6. Modifications ................................................................................................19
23.7. Signs ..............................................................................................................19
23.8. Binding Effect. ..............................................................................................19
23.9. Time of Essence ...........................................................................................19
23.10. Effect of Invalidity .......................................................................................19
23.11. Force Majeure ...............................................................................................19

23.12. Applicable Law....20
23.13. Venue....20
23.14. Counterpart Signatures....20
23.15. Exhibits and Schedules ....20

EXHIBIT A

EXHIBIT B

EXHIBIT C

## LEASE AGREEMENT

This Lease Agreement is by and between Matson Navigation Company of Alaska, LLC, a Delaware corporation ("Landlord), and Paradigm Marine, LLC, a Florida company that is registered, licensed and qualified to operate in Alaska ("Tenant).

## RECITALS

A. Landlord is the owner and/or lessee (under a lease with the U.S. Fish & Wildlife Services ("USF&W") and/or permittee (under an encroachment permit with the Alaska DOT&PF) of the real property, including all of the improvements located on such property, located at 7205 W. Rezanof Drive, in Kodiak, Alaska and known as the "Womans Bay Terminal."

B. Tenant provides comprehensive marine solutions in the areas of oil spill response, salvage, and vessel towing throughout the Gulf of Alaska, the Alaska Peninsula, and the Aleutians.

C. Tenant intends to establish the Pacific Rim Response Center on the Premises, which would provide oil spill response, and salvage and marine firefighting services. They further intend to dock vessels and barges related to their spill response and towing operations. From time to time those vessels will require repair or maintenance, which services may or may not be performed at the terminal.

D. The parties acknowledge that Landlord is leasing other portions of the Womans Bay Terminal (not included in the Premises, as defined below) to, and allowing use of its southern dock to, certain other parties under written leases or agreements.

E. The parties now wish to enter into a lease between them for the Womans Bay Terminal.

## TERMS

NOW, THEREFORE, in consideration of the mutual promises, covenants, and agreements contained in this lease, the parties covenant, promise, and agree with each other as follows:

### 1. DESCRIPTION OF LEASED PREMISES; DEMISE

#### 1.1. Premises

Landlord leases and subleases to Tenant on an exclusive basis, and Tenant leases and subleases from Landlord on an exclusive basis, a portion of the Womans Bay Terminal, which portion is legally described and designated In Exhibits A and B to this Agreement, respectively. The portion of the Womans Bay Terminal leased by Tenant is referred to in this Lease Agreement as the

"Premises."

## 2. TERM

### 2.1. Initial Term

The initial term of the lease evidenced by this Lease Agreement (the "Initial Term") begins at 12:01am on November 1, 2020, and shall terminate at 11:59 p.m. on October 31, 2023, unless renewed or terminated earlier in accordance with this lease Agreement.

### 2.2. Renewal Terms

2.2.1. Provided Tenant is not then in default under this Lease Agreement and at Landlord's sole discretion, Tenant may elect to renew the Lease Term for an additional 2-year term (the "First Renewal Term") by delivering written notice of such election to Landlord no less than one hundred eighty (180) days prior to the expiration of the Initial Term. The First Renewal Term, if any, shall run from November 1, 2023 through October 31, 2025.

2.2.2. Provided Tenant is not then in default under this Lease Agreement and at Landlord's sole discretion, Tenant may elect to renew the Lease Term for a second additional 2-year term (the "Second Renewal Term) by delivering written notice of such election to Landlord no less than one hundred eighty (180) days prior to the expiration of the First Renewal Term. The Second Renewal Term, if any, shall run from November 1, 2025 through October 31, 2027.

### 2.3. Additional Provisions Regarding Term

The Initial Term and the First and Second Renewal Terms are referred to in this lease as "the Lease Term." All terms of this Lease Agreement shall apply to each Renewal Term (if any) except that the amount of Base Rent shall be increased as set forth in Section 3.4.

### 2.4. Holdover Tenancy

If Tenant holds over or remains In possession or occupancy of the Premises after the expiration of the Lease Term or after any sooner termination without any written lease agreement for the Premises being actually made and entered Into between Landlord and Tenant, such holding over or continued possession or occupancy shall not be deemed or held to operate as any renewal or extension of this Lease Agreement. If Rent is paid by Tenant and accepted by Landlord for or during any period of time, or if Tenant remains in possession or occupancy, such holdover shall create a tenancy from month-to-month at a Base Rent equal to 120% of the Base Rent as of the date of expiration or termination of the Term and in accordance with all of the provisions specified in this Lease Agreement, subject to the same rent adjustments, which may at any time be terminated by either Landlord or Tenant

giving to the other thirty (30) days' notice of such intention to terminate the same.

## 3. RENT

### 3.1. **Base Rent During Initial Term**

Tenant shall, and hereby agrees to, pay to Landlord a fixed monthly rent of SEVENTEEN THOUSAND DOLLARS ($17,000) per month (the "Initial Base Rent") during the first year of Initial Term of this Lease Agreement. Thereafter, the Base Rent during the Initial Term will increase annually, effective October 1, based on the most recent Consumer Price Index - Anchorage Area, pursuant to Section 3.2 below, provided that in no event shall the monthly rent be less than the immediately previous Base Rent. Rent covers without limitation, Landlord's insurance costs for property insurance costs, fees and related charges which Landlord deems necessary to carry on, for or in connection with the Premises, as well as all deductibles relating to such coverage (herein collectively referred to as "Insurance").

### 3.2. CPI Index

The CPI Index shall be the Consumer Price Index - All Urban Consumers - Anchorage, AK - All Items as published by the Bureau of Labor Standards. The CPI Index for the month nearest to the date on which the adjustment is made shall be deemed to be the latest version of the Index that is published. The increase in rent will be based on the increase, if any, over the past year up to the latest version of the CIP Index. If the CPI Index is hereafter converted to a different standard reference base or otherwise revised, the adjustment shall be made with the use of such conversion factor, formula, or table for converting the Index as may be published by the Bureau of Labor Statistics. If the CPI Index and/or a conversion factor shall cease to be published, then, for the purposes of this Lease Agreement, there shall be substituted for that Index such other comparable index as Landlord may select in the exercise of its reasonable discretion.

### 3.3. Payments Due under Tariff such as Wharfage and Dockage

In addition to the Base Rent, Tenant shall pay to Landlord all amounts due under the then current Womans Bay Terminal Tariff No. 301 document, which may be amended from time to time, including wharfage and dockage, for all Cargo-Handling Activity occurring at the Premises during the Lease Term. The currently effective Tariff document is attached to this Agreement as Schedule 3.3. Cargo is any freight for hire loaded onto or off of boats or barges. It should not include Tenant or Subtenants equipment and or stores used in the course of their operations.

For Cargo handling, Tenant shall provide to Landlord the necessary wharfage weight, vessel dockage, and other information for cargo vessels using the dock, including vessels not related to Tenant's operations, for each calendar month within 15 days following the end of such month. Tenant shall pay to

Landlord all wharfage, dockage and other amounts due from Tenant under the Tariff for such calendar month within 45 days following the end of such month. Base Rent and amounts due under this Section 3.3 are each and together referred to in this Agreement as “Rent.” The parties agree and acknowledge that to the extent any term of the Tariff differs from the terms of this Lease Agreement, the terms of this Lease Agreement shall control. For purposes of this provision, Cargo Handling Activity shall only apply to Tenant for use of Premises for activity not related to oil spill preparedness and response services as set forth more fully in Sec. 5.1.

**3.4. Base Rent After Initial Term**

3.4.1. If this Lease Agreement is still then in effect, the monthly Base Rent for the period commencing on November 1, 2023 and ending two years later shall be the product of the Initial Base Rent as adjusted for year three, multiplied by 105%. This new rent shall constitute the "Base Rent."

3.4.2. If this Lease Agreement Is still then in effect, the monthly Base Rent for the period commencing on November 1, 2025 and ending two years later shall be the product of the previous Base Rent (calculated pursuant to Section 3.4.1 above) multiplied by 105%. This new monthly rent shall constitute the "Base Rent"

In the event this Lease Agreement is still then in effect or there is a holdover tenancy as described in Section 2.4, the monthly Base Rent shall be similarly recalculated every year in the manner provided in Sections 3.4.1 and 3.4.2 above. Each new recalculated monthly rent shall constitute the "Base Rent"

**3.5. Additional Rent**

All unpaid taxes, assessments, insurance premiums, maintenance, repairs, utility costs, fees, and other costs and monetary obligations required to be paid by Tenant to or for the benefit of Landlord under this Lease Agreement shall constitute Additional Rent immediately owed to Landlord. Base Rent and Additional Rent are each and together referred to in this Lease Agreement as "Rent."

**3.6. Payments of Rent**

All payments of Base Rent shall be paid in advance and shall be due to Landlord on the first (1st) day of each calendar month during the Term of the Lease. Base Rent for any partial calendar month shall be prorated based on a 30-day month. All payments of Rent shall be payable electronically by ACH transfer into Landlord's bank account, in accordance with instructions provided to Tenant by Landlord separately from this Agreement, or as otherwise designated in writing by Landlord.

**3.7. Liquidated Damages**

Rent not paid within five (5) days of its due date shall incur an administrative fee equal to five percent (5%) of the Rent amount past due. In addition, interest shall accrue on unpaid Rent and administrative fees at the rate of twelve percent (12%) per annum, compounded monthly. The foregoing administrative fee and interest shall also apply to all past due payments of Additional Rent.

4. TAXES AND ASSESSMENTS

**4.1. Sales Tax on Rent Paid Under this Lease Agreement**

In the event Landlord is obligated to pay any city, borough, state, or other sales tax on the Rent payable by Tenant to Landlord under this Lease Agreement, then, along with each monthly payment of Base Rent, Tenant shall pay to Landlord an additional amount equal to the amount of Landlord's sales tax liability on such monthly Rent payment This additional amount payable by Tenant to cover Landlord's sales tax shall not constitute Additional Rent notwithstanding anything else to the contrary contained in this Lease Agreement

**4.2. Real Property Taxes and Assessments • Payment by Landlord**

Landlord shall pay any taxes or assessments imposed on the Premises.

**4.3. Personal Property Taxes**

Tenant shall pay its personal property taxes as levied by any state, borough, or municipal corporation and will keep the Premises free of any lien as to such personal property taxes.

5. **USE OF PROPERTY**

**5.1. Regional Oil Spill Response Hub**

The Premises may be used for Tenant's Oil Spill Response operations, Salvage and Marine Firefighting business, related to the prevention, control, containment and cleanup of oil or petroleum, including storage and maintenance of related equipment, supplies and devices, moorage and operation of related vessels and barges, training and exercises, coordinating response operations, and other activities related to such purposes. They further intend to dock vessels and barges related to their spill response and towing operations. From time to time those vessels will require repair or maintenance, which services may or may not be performed at the terminal.

Tenant agrees to restrict its use to such purpose and not to use or permit the use of the Premises for any other purpose, except with Landlord's prior written consent.

### 5.2. No Assignment or Sublease by Tenant

Tenant shall not cause or suffer an assignment of all or any part of this Lease Agreement, or sublease all or any part of the Premises, or grant any right or privilege connected with the Premises, without first obtaining Landlord's written consent, or allow any other person, except Tenant's agents and employees, to occupy the Premises without first obtaining Landlord's written consent. Landlord's consent shall not be unreasonably withheld, conditioned or delayed. One consent by Landlord shall not be consent to a subsequent assignment, sublease, or occupation by other persons. Tenant's unauthorized assignment, sublease, or license to occupy shall be void, and shall be a default under this Lease Agreement. Tenant's interest in this Lease Agreement is not assignable by operation of law, nor is any assignment of its interest in this Lease Agreement, without Landlord's written consent. If Landlord consents to any transfer of this Lease Agreement by Tenant, Tenant shall nevertheless remain fully liable to Landlord for the full payment of the Rent, Taxes, assessments, and all other Tenant obligations according to the terms of this Lease Agreement. For purposes of this Lease Agreement, a sale or transfer of a 50% or greater ownership interest in Tenant shall be considered an assignment by Tenant requiring Landlord's consent under this Lease Agreement.

## 6. TENANT'S ACCEPTANCE OF PREMISES

The Premises shall be delivered to Tenant clean and free of debris. The parties acknowledge that Tenant has inspected the Premises and that Tenant is familiar with the Premises. TENANT ACCEPTS THE PREMISES IN ITS "AS IS" CONDITION. TENANT ACCEPTS THE PREMISES AS IS IN RELIANCE UPON TENANT'S OWN KNOWLEDGE. LANDLORD MAKES NO REPRESENTATIONS OR WARRANTIES OF ANY TYPE WHATSOEVER, INCLUDING WITHOUT LIMITATION, WHETHER THERE HAS BEEN OR ARE CURRENTLY ANY VIOLATIONS OF ANY COVENANTS OR RESTRICTIONS OF RECORD, OR ANY APPLICABLE LAWS IN EFFECT REGARDING THE PREMISES ON THE COMMENCEMENT DATE. Landlord is not aware of any violations of law regarding the Premises.

## 7. NO WASTE, NUISANCE, OR UNLAWFUL USE

Tenant shall not commit, nor allow to be committed, any waste or nuisance on the Premises, nor shall it use or allow the Premises to be used for any unlawful purpose. All repairs, alterations, additions, or improvements made by Tenant are subject to the approval of Landlord pursuant to Section 11, and shall comply with applicable building codes. Tenant shall at all times use and maintain the Premises so as to fully meet and comply with all federal, state, or local constitutions, statutes, regulations, rules, rulings, zoning, and other ordinances, building and other codes, interpretive releases, administrative orders, and the like as issued and as may be amended from time to time relating to the Premises or Tenant's operations on the Premises (collectively,

"Laws").

## 8. ENTRY BY LANDLORD

Tenant shall permit Landlord and its agents to enter the Premises at mutually agreeable times for the purposes of inspections, and at all reasonable times for the purposes of inspections, and at all reasonable times for the purposes of posting notices of non-liability for alterations, additions, or repairs, or placing upon the Premises any usual or ordinary "for sale," "for lease," or like signs. Except in emergencies, Landlord shall give Tenant reasonable notice.

## 9. TENANT'S REPAIRS, MAINTENANCE ANO OTHER OBLIGATIONS

### 9.1. Tenant Responsible for All Repairs, Restorations

Tenant shall at all times during the Lease Term and at Tenant's sole expense make all necessary replacements, restorations, renewals and repairs to the Premises, whether interior or exterior, structural or nonstructural, ordinary or extraordinary and foreseen or unforeseen to the extent not covered by Landlord's insurance. Repairs, restorations, renewals and replacements shall be at least equivalent in quality to the original work or the property replaced, as the case may be. Tenant's obligations shall include maintaining in good and full repair and order and good, serviceable and safe condition the Premise's fender system.

9.1.1. Tenant shall also, at its own expense, maintain in safe and good condition and free from dirt, snow, ice, rubbish, and other obstructions or encumbrances, the yard, parking lot, and means of ingress and egress to the Premises.

9.1.2. Tenant shall also be responsible at its sole expense for re-grading and backfilling the yard at least two times per year.

9.1.3. Tenant shall keep the Premises In as good order and condition as when delivered to it, excepting only ordinary wear and tear. Tenant will promptly comply with all Laws (as defined in Section 7) that apply to the Premises and Tenant's use of the Premises.

9.1.4. Tenant shall not make any claim or demand upon or bring any action against Landlord for any loss, cost, injury, damage, or other expenses caused by any failure or defect, structural or non-structural, of the Premises.

9.1.5. Tenant shall follow manufacture's guidelines on the waste oil heater and be responsible for keeping it in good working order.

### 9.2. Maintenance Services

Tenant shall be responsible for all maintenance costs associated with the

Premises, including landscaping, parking lot, and maintenance (to include snow and ice removal), and will, at all times, keep the Premises neat, clean, and in a sanitary condition.

### 9.3. Utilities

Tenant shall initiate, contract for, and obtain in its name all utility services required for the Premises. Tenant will pay when due all charges, including connection charges, for electricity, water, gas, heat, telephone service, solid waste, and for all other public utilities and assessments, if any, which shall be used in or charged against the Premises. Tenant will be solely responsible for the upkeep of the septic system.

## 10. LANDLORD'S REPAIR OR MAINTENANCE OBLIGATIONS

Landlord shall be responsible at its expense to maintain and repair the sheet pile dock located on the Premises, except that Landlord shall not be responsible to repair damage caused by Tenant (or Tenant's invitees or permitees) or resulting from Tenant's activities (or the activities of Tenant's invitees or permitees) on the Premises, reasonable wear and tear excepted. Except for the obligations of Landlord relating to the sheet pile dock or under Section 17 (relating to the condemnation of the Premises), it is intended by the parties that Landlord have no obligation, in any manner whatsoever, to repair or maintain the Premises nor any improvements, fixtures, equipment or personal property in or on the Premises, whether interior or exterior, structural or non-structural, ordinary or extraordinary, all of which obligations are that of Tenant under Section 9 above..

## 11. TENANT'S IMPROVEMENTS AND ALTERATIONS

### 11.1. Notice

Tenant may not install any trade fixtures, make interior alterations to the improvements, construct additional improvements, and/or reconstruct improvements unless Tenant first gives Landlord written notice at least fifteen (15 days prior to commencing any such work. Such written notice shall include plans for such improvements or alterations in sufficient detail to allow Landlord to understand the impact to the Premises. Landlord shall have fifteen (15) days after receipt of Tenant's notice under this Section to approve or disapprove Tenant's plans.

### 11.2. Tenant Liable for all Costs

In the event Tenant alters any improvements or makes any new improvements on the Premises, Tenant covenants and agrees to pay all costs, expenses, and liabilities arising out of or in any way connected with such alterations and/or improvements, and to defend, hold harmless, and indemnify Landlord from or against any such costs, expenses, and liabilities, including but

not by way of limitation, all or any liabilities or mechanics, laborers, and/or materialman's liens, or other liens of a similar nature.

### 11.3. Ownership on Termination of Lease

All buildings, electrical systems, and other trade fixtures installed and paid for by Tenant during the Lease Term shall belong to Tenant and shall be removed by Tenant at its sole cost and expense prior to the expiration or termination of the Lease Term, unless the parties otherwise agree. In the case of such removal, Tenant shall also, prior to the expiration or termination of the Lease Term, and at Tenant's sole cost and expense, fully restore the Premises to their condition as of the Commencement Date. In the event Tenant removes its electrical equipment upon expiration or termination of the Lease Term, Tenant shall also remove all underground conduit installed by Tenant. In the event any trade fixtures or other property of Tenant remains on the Premises thirty (30) days after the expiration or termination of the Lease Term, Landlord may at its option and upon five (5) days written notice to Tenant either: (i) remove such property and charge Tenant for all removal and restoration costs, in which case Landlord shall have a lien on such property to the extent of such removal and removal costs: or (ii) deem such property to be abandoned, In which case Landlord shall become the owner of such property. In any event, Tenant shall be considered a holdover tenant for any period of time following expiration or termination of the Lease Term that Tenant's property remains on the Premises or Tenant has not restored the Premises following such removal.

### 11.4. No Permanent Structures on USF&W Property

Tenant acknowledges that the lease between Landlord and USF&W prohibits the construction of any permanent structures on USF&Ws property. Tenant shall not construct any permanent structures on the portion of the Premises leased by Landlord from USF&W (and subleased from Landlord to Tenant under this Lease Agreement).

## 12. TENANT'S OBLIGATIONS ON TERMINATION OF LEASE

### 12.1. Tenant's Obligation to Re-Grade Yard

At the expiration or earlier termination of the Lease Term and unless the parties otherwise agree, Tenant shall re-grade the yard to its condition as of the Commencement Date.

### 12.2. Tenant's General Obligations

On the expiration or earlier termination of the Lease Term and subject to the provisions of Section 11.3 of this Lease Agreement, Tenant shall remove from the Premises all personal property of Tenant's. Tenant shall leave the Premises In good condition and free from all waste and debris, excepting

ordinary wear and tear or resulting from condemnation. Tenant shall comply with all regulations of the Alaska Department of Conservation in removing and disposing of all such debris. Any personal property belonging to Tenant and remaining on the Premises after expiration or earlier termination of the Lease Term shall be subject to the provisions of Section 11.3 of this Agreement.

## 13. LIENS AND LIEN CONTESTS

Tenant shall not do or suffer anything to be done so that the Premises may be encumbered by any mechanic's or similar lien and if, whenever and as often as any mechanic's or similar lien is filed against the Premises, done by, for, or under the authority of Tenant or anyone claiming by, through, or under Tenant, Tenant shall discharge the same of record, within ten (10) days after the date of filing.

Notwithstanding the foregoing, Tenant shall have the right to contest any such mechanic's or other lien claim filed against the Premises if within such ten (10) day period Tenant notifies Landlord of Tenant's intention to do so, provided that Tenant shall diligently prosecute any such contest, at all times effectually stay or prevent any official or judicial sale of the Premises or any part of the Premises under execution or otherwise, and pay or otherwise satisfy any final judgment adjudicating or enforcing such contested mechanic's or other lien claim, and thereafter promptly procure record release and satisfaction of any such lien. Landlord agrees to cooperate fully with Tenant in good faith during the course of such contest.

Tenant shall make no contract or agreement for the construction, alteration, or repair of any portion of the Premises without first obtaining an acknowledgement from the contractor that such work is being performed on leasehold premises and an express waiver by such contractor of any and all claims for mechanic's or materialmen's liens against Landlord's interest in the Premises. Tenant shall keep the Premises free from any liens arising out of any work performed, materials furnished, or obligations incurred by Tenant. In the event that any work is to be performed by Tenant for an amount in excess of Five Thousand Dollars ($5,000), in addition to the notice and consent required by Section 11.1, Tenant shall also give Landlord at least ten (10) days written notice prior to the commencement of the work in order for Landlord to post a notice of non-responsibility upon the Premises. Tenant agrees to pay and discharge, when due, all charges for labor and materials contracted by Tenant, and covenants to do no act which will cause or have attempted to be caused the Premises to be encumbered by a labor, material, or other lien.

## 14. TENANT TO CARRY INSURANCE

### 14.1. Liability Insurance

Tenant agrees to procure and maintain in force during the Lease Term, at its expense, marine liability and general liability insurance, including environmental and pollution liability insurance, to protect Landlord and Tenant

against liability for damage claims through public use of or arising out of accidents occurring in or around the Premises in a minimum amount of Five Million Dollars ($5,000,000.00) for each person injured, Five Million Dollars ($5,000,000.00) for any one accident, and Five Million ($5,000,000.00) for property damage.

### 14.2. Casualty and All-Risk Insurance

a. Landlord shall maintain in force during the term of this Lease Agreement fire and extended coverage (all risk) insurance in an amount not less than one hundred percent (100%) of the full Replacement Value of the Premises including building occupied by Tenant on Premises and dock used by Tenant on Premises. Such insurance shall waive subrogation against the Tenant and shall provide coverage under a "Special Form" policy against loss or damage by earthquake, hurricane, typhoon, volcanic eruption, tsunami, storm, flood, fire, and any other hazard, with extended coverage, vandalism and malicious mischief endorsements and demolition clause, if applicable, to the extent of the full replacement cost without deduction for depreciation. Any such insurance carried by Landlord shall be secondary to the insurance maintained by Tenant under this Section 14.2. The cost of all such insurance shall be included as part of the Rent charged to Tenant as set forth in Section 3.1 Tenant shall not do anything that would make void or voidable any insurance maintained by Tenant or Landlord on the Premises or Property.

b. Tenant shall maintain all risk" or "special form" property insurance (including, without limitation, flood and earthquake coverage) covering the full replacement cost of all Tenant-Made Alterations, Trade Fixtures, improvements and Tenant's personal property installed or placed in the Premises.

### 14.3. Waiver of Indemnity and Subrogation

Tenant hereby waives, as against Landlord, any and all claims or demands of whatsoever nature for damage to the Premises and to Tenant's property, or the property of any third party on the Premises that is caused by or result from fire and/or other perils, events, or happenings (whether or not caused by the negligence of Landlord or Tenant or any of their respective employees, agents, or subtenants) due to perils included in any insurance policies required to be carried by Tenant pursuant to the terms of this Lease Agreement. Tenant shall obtain from its insurer under each insurance policy it maintains a waiver of all rights of subrogation which Tenant's insurer may have against Landlord, and Tenant shall defend, indemnify and hold harmless Landlord against loss or expense, including reasonable attorney fees, resulting from the failure to obtain such waiver.

### 14.4. Workers Compensation Insurance

Tenant shall also maintain workers compensation insurance in a minimum

amount of the Alaska statutory requirement.

### 14.5. Longshore and Harbor Workers Compensation Act Insurance

Tenant shall also maintain, to the extent applicable to Tenant's operations, insurance coverage in compliance with the statutory requirements of the U.S. Longshore and Harbor Workers Compensation Act.

### 14.6. Insurance Policies

Landlord shall be named as an additional insured on the policies required by Section 14.1 and 14.2. Tenant shall deliver certificates of insurance to Landlord within ten (10) days of the execution of this Agreement and thereafter upon Landlord's request. Tenant agrees to obtain a written obligation from the Insurers to notify Landlord In writing at least thirty (30) days prior to cancellation or refusal to renew any such policies. Tenant agrees that, if such Insurance policies are not kept in force during the entire term of this Lease Agreement, Landlord, after ten (10) days written notice is sent, may procure the necessary insurance and pay the premium, and that such premium shall be repaid to Landlord by Tenant as Additional Rent for the month following the date on which the premium is paid.

## 15. DESTRUCTION OF PROPERTY

### 15.1. Substantial Damage - Insurance Coverage

In the event that the Premises are damaged or destroyed by fire or other casualty that is covered by the fire and extended coverage insurance required to be maintained by Tenant under this Lease Agreement, and if the Lease Term is not terminated as hereinafter provided, and if the insurance proceeds (together with the deductible amount for which Tenant is responsible) are sufficient, Tenant shall proceed with reasonable diligence and at its sole cost and expense to rebuild and repair the Premises so that, upon completion thereof, the Premises will be in substantially the same condition (consistent with all Laws, as defined in Section 7) as prior to the damage or destruction. Such repairs, restoration, or rebuilding shall be diligently completed in a good workmanlike manner. If the necessary repairs, restoration, or rebuilding have not been completed within ninety (90) days after the date of such damage or destruction, then Landlord may, at its option, elect to terminate the Lease Agreement by giving written notice to Tenant; provided that if Tenant is unable, because of strikes, weather, or other causes clearly beyond Tenant's control, including any unavoidable delaying issuance of any required approval or permit by any governmental authority or delay in receipt of funds from any applicable insurer, to complete repair, restore, or rebuild within that time period, the date after which option may be exercised shall be extended for a reasonable period to allow for cessation of the cause of the delay.

### 15.2. Substantial Damage; No Insurance Coverage

In the event the Premises are destroyed or substantially damaged by a

casualty that is not and would not be covered by the fire and extended coverage insurance required to be maintained by Tenant under the terms of this Lease Agreement, or if the insurance proceeds under such insurance coverage (together with the deductible amount for which Tenant is responsible under such insurance policies) is not sufficient, then Landlord may elect either to terminate the Lease Term or to proceed to rebuild and repair the Premises. If Landlord elects to terminate the Lease Term, then Landlord shall give written notice to Tenant of such election within sixty (60) days after the occurrence of such casualty.

## 16. RISK OF DAMAGE OR LOSS TO TENANT'S PERSONAL PROPERTY

As between the parties, risk of damage or loss to Tenant's personal property located in the Premises, from whatever cause arising, shall be upon Tenant. All obligations for insurance upon such contents shall be upon Tenant to maintain such insurance as Tenant deems appropriate.

## 17. EFFECT OF EMINENT DOMAIN PROCEEDINGS

In the event eminent domain proceedings result in the condemnation of a portion of the Premises that leaves the rest unusable by Tenant for purpose of the business for which the Premises are leased, Tenant shall have the option to terminate this Lease Agreement by giving written notice of termination to Landlord within thirty (30) days following the condemnation.

In the event the Lease Agreement is not terminated, the effect of such condemnation will be to terminate the Lease as to the portion of the Premises condemned, and leave the Lease in effect as to the remainder of the Premises. Tenant's rental for the remainder of the Lease Term shall in such case be reduced by the amount that the usefulness of the Premises to Tenant for its business purposes is reduced. All compensation awarded in the eminent domain proceeding as a result of the condemnation shall belong to Landlord, except that if a separate award is given for Tenant's personal property or moving expenses, that award shall belong to Tenant. Tenant hereby assigns and transfers to Landlord any claim Tenant may have to compensation for damages as a result of such condemnation. Tenant shall have the right to seek from the condemning authority damages for relocation so long as that action does not affect Landlord's compensation.

## 18. ENVIRONMENTAL MATTERS

### 18.1. Landlord Warranty

Landlord warrants that they are not aware of any environmental conditions on the Premises, including on surface and sub-surface soils used to backfill the Premises, that would be out of compliance with applicable environmental laws or that would interfere with Tenant’s quiet enjoying of Premises.

### 18.2. Compliance with Environmental Law

Tenant will not cause any Hazardous Material to be brought upon, kept, or used in or on the Premises for a purpose prohibited by or that could result in liability under any Environmental Law, as defined in Section 18.3. Tenant shall comply with all Environmental Laws and prudent industry practice relating to the presence, treatment, storage, transportation, disposal, release, or management of Hazardous Materials in, on, under or about the Premises that Tenant brings onto, keeps or uses on the Premises, and will notify Landlord of any and all Hazardous Materials that Tenant brings upon, keeps or uses on the Premises (other than small quantities of cleaning or other or supplies as are customarily used by a tenants of similar premises). On or before the expiration or earlier termination of the Lease Term, Tenant, at its sole cost and expense, will completely remove from the Premises (regardless whether any Environmental Law requires removal), in compliance with all Environmental Law, all Hazardous Materials that Tenant causes to be present in, on, under, or about the Premises.

### 18.3. Environmental Law and Hazardous Material

The term “Environmental Law" means any current or future federal, state, or local statute, regulation, ordinance, code, rule or requirement, relating to the emission, discharge, release or threatened release of a Hazardous Material into the air, surface water, groundwater or land, or relating to the manufacturing, processing, use, treatment, storage, disposal, transportation or handling of a Hazardous Material, or otherwise relating to the protection of human health or the environment, including without limitation, the Clean Air Act, the Federal Water Pollution Control Act, the Resource Conservation and Recovery Act, the Occupational Safety and Health Act, and the Comprehensive Environmental Response, Compensation and Liability Act, all amendments thereto, all rules, regulations, orders, or directives promulgated or issued thereunder, and their state statutory and regulatory counterparts. "Hazardous Material” means any solid, liquid or gaseous substance, chemical compound, product, byproduct, or material which is or becomes regulated, defined, or designated by any applicable federal, state, or local governmental authority as hazardous, extremely hazardous, imminently hazardous, dangerous, or toxic, or as a pollutant, contaminant, or waste, and shall include, without limitation, asbestos, polychlorinated biphenyls, oil, and all forms of petroleum and related by-products and hydrocarbons.

## 19. DEFAULTS

### 19.1. Events of Default

The following shall constitute default of this Lease Agreement by Tenant:

(a) Failure to pay any portion of the Rent by its due date and such failure is not cured within ten (10) days following written notice from Landlord;

(b) Breach in any other term or conditions of this Lease Agreement to be performed by Tenant, and such breach continues for thirty (30) days after written notice from Landlord without commencement and diligent pursuit of cure of said breach, or thereafter Tenant fails to diligently pursue the cure to completion; or

(c) There is the making by Tenant of any general assignment, or general arrangement for the benefit of creditors; the filing by or against Tenant of a petition to have Tenant adjudged bankrupt or a petition for reorganization or arrangement under any law relating to bankruptcy (unless, in the case of a petition filed against Tenant, the same is dismissed within sixty (60) days); the appointment of a trustee or receiver to take possession of substantially all of Tenant's assets located in the Premises or of Tenant's interest in this Lease Agreement, where possession is not restored to Tenant within thirty (30) days; or the attachment, execution or other judicial seizure of substantially all of Tenant's assets located at the Premises or of Tenant's interest in this Lease Agreement, where such seizure is not discharged within thirty (30) days.

**19.2. Landlord's Remedies**

In the event of any such default by Tenant, Landlord may at any time thereafter, with or without notice or demand and without limiting Landlord in the exercise of any right or remedy which Landlord may have by reason of such default:

(a) Terminate Tenant's right to possession of the Premises by any lawful means, in which case this Lease Agreement and the Lease Term shall terminate, and Tenant shall immediately surrender possession of the Premises to Landlord. In such event, Landlord shall be entitled to recover from Tenant all damages incurred by Landlord by reason of Tenant's default including, but not limited to, the cost of recovering possession of the Premises, expenses of reletting, reasonable attorney's fees, and any real estate commission actually paid, the amount by which the unpaid Rent for the balance of the term after the time of the award exceeds the amount of such rental loss for the same period that Tenant proves could be reasonably avoided.

(b) Maintain Tenant's right to possession, in which case the Lease Term and this Lease Agreement shall continue in effect whether or not Tenant shall have abandoned the Premises. In such event Landlord shall be entitled to enforce all of Landlord's rights and remedies under this Lease Agreement, including the right to recover the Rent as it becomes due under this Lease Agreement.

(c) Pursue any other remedy now or hereafter available to Landlord.

19.3. **Tenant's Remedies**

If Landlord violates, neglects or fails to perform or observe any of the representations or

conditions contained in this Lease on its part to be performed or observed, which default continues for a period of more than thirty (30) days after receipt of written notice from Tenant specifying such default or if such default is of a nature to require more than thirty (30) days for remedy and continues beyond the time reasonably necessary to cure (provided Landlord must have undertaken procedures to cure the default within such thirty (30) day period and thereafter diligently pursues such efforts to cure to completion),Tenant, at its option (in addition to all other rights and remedies provided Tenant at law, in equity or hereunder), upon further written notice to Landlord of Tenant's intention, may terminate this Lease upon 30 days' written notice thereof given to Landlord.

## 20. COVENANT OF QUIET ENJOYMENT

Landlord covenants that Landlord has full right to make this Lease Agreement, and that Tenant shall have full, quiet, and peaceable possession of the Premises during the Lease Term and so long as Tenant is not in default.

## 21. ESTOPPEL STATEMENTS

Tenant shall, at any time and from time to time, upon not less than ten (10) days' prior to written notice from Landlord, execute, acknowledge and deliver to Landlord a statement in writing (a) certifying that this Lease Agreement is unmodified and in full force and effect (or, if modified, stating the nature of such modification and certifying that this Lease Agreement, as so modified, is in full force and effect), and the date to which Rent and other charges are paid in advance, if any; (b) acknowledging that to Tenant's knowledge there are no uncured defaults on the part of Landlord under the

Lease Agreement, or specifying such defaults if any are claimed; (c) setting forth the date of commencement of Rents and expiration of the Term of the Lease; and (d) any other reasonable terms concerning the status of this Lease Agreement as noted by Landlord's legal counsel. Any such statement may be relied upon by the prospective purchaser or encumbrancer of the Premises.

## 22. INDEMNITY

### 22.1. Indemnification by Tenant

Tenant shall defend, indemnify, and hold harmless Landlord, its affiliates, assignees, and their respective directors, officers, shareholders, agents and employees (each an "Indemnified Person") from and against any and all claims, liabilities, lawsuits, damages, judgments, consent agreements and orders, assessments, fines, penalties, costs (including cleanup, remediation and response costs), losses (including, without limitation, diminution in value of the Premises, sums paid In settlement of claims and death of or injury to any person or damage to any property whatsoever), and other liabilities, both real and alleged (collectively, "Liabilities"), and will reimburse each Indemnified

Person for all fees and expenses (including court costs, and experts', consultants' and attorneys' fees and disbursements) (collectively, "Expenses") as they are incurred in investigating, preparing, pursuing or defending any claim, action, proceeding or investigation, whether or not in connection with pending or threatened litigation and whether or not any Indemnified Person is a party (collectively, "Actions"), which may arise from:

(a) Any breach by, or failure to comply with and perform the requirements and provisions of, this Lease Agreement by Tenant;

(b) The release or discharge of Hazardous Material by Tenant, Tenant's employees, agents, contractors, or invitees on the Premises or in violation of any Environmental Law or in deviation from prescribed procedures in Tenant's use or storage of Hazardous Material; or

(c) Tenant's conduct of its business operations at the Premises.

**22.2. Demand by Indemnified Person**

Any demand for defense or indemnification by an Indemnified Person pursuant to this Section shall be made by giving written notice to Tenant as provided In Section 23.1. Tenant shall be obligated to provide legal counsel for the Indemnified Person (with counsel subject to the approval of the Indemnified Person) and to defend and Indemnify the Indemnified Person within ten (10) days after receipt of the demand for defense and indemnification, and the failure to honor such a demand within the 10-day period shall be deemed a breach of this Lease Agreement.

**22.3. Not Exclusive/Survival**

The rights of the Indemnified Party under this Section 22 shall be In addition to any other rights the Indemnified Party may have under any law or otherwise. Tenant's obligations under this Section 22 shall survive for a period of six (6) years following termination of the Lease Term, or, if later, upon expiration of any applicable statute of limitations.

**23. ADDITIONAL PROVISIONS**

**23.1. First Right of Refusal**.

If, at any time during the term of this Lease, Landlord desires to transfer any portion of its interest (leasehold or otherwise) in the Premises or the portion of Womans Bay Terminal not part of the Premises, it shall notify Tenant in writing of the party to whom it desires to transfer such interest and the price at which and the terms upon which it desires to transfer the same, and Tenant, so long as it is not then in default, shall, within 30 days of receipt of the notice, notify Landlord in writing whether it wishes to purchase or otherwise acquire such interest on the terms set forth in the notice. If Tenant elects to purchase or otherwise acquire such interest, Landlord shall be bound to convey, assign, or otherwise transfer such interest to Tenant on such price, terms and conditions. Tenant shall consummate the

purchase within sixty (60) days following Tenant's delivery of the election to purchase to Landlord. If Tenant elects not to purchase such interest or fails to give notice of its intention within the 30-day period, Tenant's right of first refusal shall thereupon be extinguished, and Landlord shall be free to convey, assign, or otherwise transfer such interest to the third party on terms as stated in the notice or on more favorable terms to Landlord than those stated in the notice. In any event, any conveyance by Landlord to a third party shall be subject to the terms of this Lease. If Landlord shall not have so disposed of such interest to said third party within 60 days after receipt of notice that Tenant elects not to exercise its right of first refusal or after expiration of Tenant's 30-day period within which to give notice, the provisions of this Section shall again apply to any proposed disposition by Landlord of any such interest.

**23.2. Notice**

Notices given pursuant to the provisions of this Lease Agreement, or necessary to carry out its provisions, shall be in writing, shall be sent by email, delivered personally to the person to whom the notice is to be given, or mailed certified or overnight service postage prepaid, addressed as follows.

If to Landlord:
Attention: Rick Kniaziowski
Matson Navigation Company of Alaska, LLC
727 W. Rezanof Dr.
Kodiak, AK 99615
Email: rkniaziowski@matson.com
Office: 907-481-4210
Mobile: 907-539-1670

If to Tenant:
Attention: Sully Sutherlin
Paradigm Marine, LLC
1314 E. Las Olas Blvd. #85
Ft. Lauderdale, FL 33301
Email: sully@paradigmmarine.com
Mobile: 305.898.3223

Either party may change its notice address by notifying the other party In accordance with this Section 23.1.

**23.3. Attorney's Fees**

If Landlord or Tenant files an action to enforce any covenant of this Lease Agreement, or for breach of any covenant in this Lease Agreement, or for unlawful detainer of the Premises, the prevailing party shall be entitled to recover reasonable attorney's fees, together with the costs incurred in such action.

**23.4. No Waiver**

No waiver or breach of any covenant by either party shall waive any such covenant or future breaches, or be deemed to be or constitute a waiver of any other covenant. No acceptance by Landlord of full or partial Rent from Tenant or any third party during the continuance of any breach or default by Tenant shall constitute Landlord's waiver of any such breach or default. No statement on a payment check from a party to this Lease Agreement or in a letter accompanying a payment check is binding on the other party. The party receiving the check, with or without notice to the other party, may negotiate the check without being bound to the conditions of any such statement.

**23.5. No Broker Commissions**

Each party warrants and represents to the other that no brokerage commission is due to any person, firm or entity with respect to this Lease Agreement, and each party agrees to defend, indemnify and hold the other party harmless with respect to any judgment, damages, legal fees, court costs, and any and all liabilities of any nature whatsoever arising from a breach of this representation.

**23.6. Modifications**

The covenants and conditions contained in this Lease Agreement are the full and complete terms of the lease evidenced by this Lease Agreement and no alterations, amendments, or modifications of the same shall be binding unless first reduced to writing and signed by both parties to this Lease Agreement.

**23.7. Signs**

Landlord agrees that, subject to required local government approval, Tenant may display signage as mutually acceptable to Landlord and Tenant. Tenant shall provide the signage at its sole cost and expense, including costs of erection and/or installment.

**23.8. Binding Effect**

The terms, covenants, and conditions of this Lease Agreement shall apply to and be binding on the affiliates, officers, directors, successors, and assigns of the parties.

**23.9. Time of Essence**

Time is of the essence in this Lease Agreement.

23.10.**Effect of Invalidity**

**23.11.** If any term or provision of this Lease Agreement, or its application to any person or circumstance shall, to any extent, be invalid or unenforceable, the remainder of this Lease Agreement, or the application of the terms and provisions to persons and circumstances other than those to which it had been held invalid or unenforceable, shall not be affected, and each term and

provision of this Lease Agreement shall be valid and enforceable to the fullest extent permitted by law.

**23.12.Force Majeure**

Time periods for either party's performance under any provision of this Lease Agreement (excluding payment of Rent) shall be extended for periods of time during which the party's performance Is prevented due to circumstances beyond such party's control, including without limitation, fires, floods, earthquakes, epidemics, pandemics, other natural catastrophes, lockouts, strikes, blockades, embargoes, governmental regulations, acts of God or public enemy, riot, civil disorder, war or other strife.

23.13.**Applicable Law**

This Lease shall be governed by and construed in accordance with the laws of the State of Alaska.

**23.14.Venue**

Venue shall be in the Third Judicial District, Anchorage, Alaska.

**23.15.Counterpart Signatures**

This Lease Agreement may be executed by the parties in counterpart signatures which, when combined, shall be one and the same document.

**23.16.Exhibits and Schedules**

The following Exhibits and Schedule attached to and described in this Lease Agreement are incorporated into this Lease Agreement by this reference as if fully set forth:

| | |
|---|---|
| Exhibit A | Legal Description of Premises |
| Exhibit B | Diagram of Premises |
| Exhibit C | Womans Bay Terminal Tariff No. 301 |

Landlord:
Matson Navigation Company of Alaska, LLC

By:______________________________
Its:

Tenant:
Paradigm Marine, LLC

By: Nickie Sutherlin
Its: MGRM

IN WITNESS WHEREOF the parties have executed this Lease Agreement as of the date first above written.

FIRST AMENDMENT TO LEASE

This First Amendment to Lease (the "Amendment") is entered into as of April 1, 2022, by and between Matson Navigation Company of Alaska, LLC ("Landlord") and Paradigm Marine, LLC ("Tenant"), with respect to the following:

A. Landlord is the landlord and Tenant is the tenant under that certain Lease Agreement dated November 1, 2020 (as amended to date, the "Lease") of certain premises located at 7205 W. Rezanof Drive as more particularly described in the Lease. Capitalized terms used and not otherwise defined herein shall have the meanings given those terms in the Lease.

B. Landlord and Tenant desire to amend the Lease on the terms and conditions provided herein.

IT IS, THEREFORE, agreed as follows:

1. Paragraph A of the Recitals is deleted in its entirety and replaced as follows:

Landlord is the owner and/or lessee (under a lease with the U.S. Fish & Wildlife Services ("USF&W") and/or permittee (under an encroachment permit with the Alaska DOT&PF) of the real property, including all of the improvements located on such property, located at 7205 W. Rezanof Drive and 7991 W. Rezanof Drive, in Kodiak, Alaska and collectively known as the "Womans Bay Terminal."

2. Paragraph D of the Recitals is deleted in its entirety.

3. Section 2.1 is amended by replacing "October 31, 2023" with "March 31, 2027".

4. Section 2.2.1 is deleted in its entirety and replaced as follows:

Provided Tenant is not then in default under this Lease Agreement, Tenant may elect to renew the Lease Term with Landlord's consent, which shall not be unreasonably conditioned, delayed or withheld, for an additional 2-year term (the "First Renewal Term") by delivering written notice of such election to Landlord no less than one hundred eighty (180) days prior to the expiration of the Initial Term. The First Renewal Term, if any, shall run from April 1, 2027 through March 31, 2029.

5. Section 2.2.2 is deleted in its entirety and replaced as follows:

Provided Tenant is not then in default under this Lease Agreement, Tenant may elect to renew the Lease Term with Landlord's consent, which shall not be unreasonably conditioned, delayed or withheld, for a second additional 2-year term (the "Second Renewal Term") by delivering written notice of such election to Landlord no less than one hundred eighty (180) days prior to the expiration of the First Renewal Term. The Second Renewal Term, if any, shall run from April 1, 2029 through March 31, 2031.

6. Section 3.1 is deleted in its entirety and replaced as follows:

Tenant shall, and hereby agrees to, pay to Landlord a fixed monthly rent of SEVENTEEN THOUSAND DOLLARS ($17,000) per month (the "Initial Base Rent") during the first year of Initial Term of this Lease Agreement. Beginning April 1, 2022 and throughout 2022, Tenant shall, and hereby agrees to pay to Landlord a fixed monthly rent of THIRTY-ONE THOUSAND, FOUR-HUNDRED, SIXTY-NINE DOLLARS ($31,469) per month, which shall constitute the "Base Rent." Thereafter, the Base Rent will increase annually, effective January 1, based on the

most recent Consumer Price Index - Anchorage Area, pursuant to Section 3.2 below, provided that in no event shall the monthly rent be less than the immediately previous Base Rent. Rent covers without limitation, Landlord's insurance costs for property insurance costs, fees and related charges which Landlord deems necessary to carry on, for or in connection with the Premises, as well as all deductibles relating to such coverage (herein collectively referred to as "Insurance").

7. Section 3.4.1 is amended by replacing "November 1, 2023" with "April 1, 2027" and replacing "year three" with "year five".

8. Section 3.4.2 is amended by replacing "November 1, 2025" with "April 1, 2029".

9. The following paragraph is added to Section 6:
   Landlord shall repair damaged sheet piling, bollards, and other damaged seawall appurtenances on the Premises no later than April 1, 2023. When completed, the seawall shall be of good quality, free from improper workmanship and defective materials, and capable of being used by Tenant in the normal course of business.

10. The second paragraph in Section 23.2 is deleted in its entirety and replaced as follows:

    If to Landlord:
    Attention: General Manager – Kodiak Operations
    Matson Navigation Company of Alaska, LLC 727
    Shelikof St.
    Kodiak, AK 99615
    Email: sfraser@matson.com
    Office: 907-481-4210
    Mobile: 907-539-1670

11. Exhibit A is deleted in its entirety at replaced with Exhibit A attached hereto.

12. Exhibit B is deleted in its entirety at replaced with Exhibit B attached hereto.

13. Except as specifically provided herein, the terms and conditions of the Lease as amended hereby are confirmed and continue in full force and effect. This Amendment shall be binding on the heirs, administrators, successors and assigns (as the case may be) of the parties hereto. This Amendment and the attached exhibits, which are hereby incorporated into and made a part of this Amendment, set forth the entire agreement between the parties with respect to the matters set forth herein. There have been no additional oral or written representations or agreements. In the case of any inconsistency between the provisions of the Lease and this Amendment, the provisions of this Amendment shall govern and control. Submission of this Amendment by Landlord is not an offer to enter into this Amendment but rather is a solicitation for such an offer by Tenant. Landlord shall not be bound by this Amendment until Landlord has executed and delivered the same to Tenant

IN WITNESS WHEREOF, this Amendment has been executed as of the date first written above.

| Landlord: | Tenant: |
|---|---|
| Matson Navigation Company of Alaska, LLC | Paradigm Marine, LLC |
| By: ______________________ | By: ______________________ |
| Its: Senior Vice President, Alaska | Its: ______________________ |